**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


MARK JACKSON,                          :
                                       :
                   Plaintiff           :        CIVIL ACTION
                                       :
            v.                         :
                                       :
ROHM AND HAAS COMPANY, et al.          :        NO.     05-4988
                                       :
                                       :
                   Defendants          :


**MEMORANDUM OF LAW IN**
**SUPPORT OF PLAINTIFF'S MOTION TO DISQUALIFY**
**HARKINS CUNNINGHAM LLP AND ITS INDIVIDUAL ATTORNEYS**

## I.      INTRODUCTION

Harkins Cunningham LLP and its individual attorneys, John G. Harkins, Jr., Esquire,

Eleanor Morris, Illoway, Esquire, Steven A. Reed, Esquire, and Colleen Healy Simpson, Esquire

(hereinafter referred to collectively as the "Harkins firm," "Harkins lawyers," or the "firm"), all

have entered appearances on behalf of the Rohm and Haas defendants.[1]  However, the Harkins

firm has manifest, irreconcilable conflicts of interest which, in addition to advancing the interests

of certain clients to the prejudice of others, have interfered with plaintiff's ability to obtain the

evidence necessary to prepare his case for trial, and otherwise interfered with the due

administration of justice.  Assuming *arguendo* any such conflicts could be waived, discovery in

the matter of *Jackson v. Rohm and Haas Company, et al.*, Philadelphia Court of Common Pleas,

April Term 2007, No. 2321 (hereinafter "Jackson I"), has revealed that the Harkins firm has not

---

[1]The Rohm and Haas defendants are those defendants other than Liberty Life Assurance
Company of Boston and Lori Hamlin. *See notes 2-4, infra.*

obtained proper waivers of any conflicts from its clients, or even sought to do so.  Further, the

Harkins firm is an "enterprise" within the meaning of RICO through which the R&H defendants

have been carrying out their racketeering activities.  Therefore, the firm's self-interest in

vindicating itself weighs against its ability to properly represent the interests of its clients.

For these and the other reasons discussed herein, the Harkins firm should be disqualified

from further participation in these proceedings, and the relief sought in the attached proposed

form of Order should be awarded.

## II.     RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

### A.     PROCEDURAL BACKGROUND

On September 19, 2003, plaintiff filed the case of *Mark Jackson v. Rohm and Haas*

*Company, et al.*, United States District Court for the Eastern District of Pennsylvania, No. 03-

5299.[2]  On September 19, 2005, plaintiff filed a separate case against Rohm and Haas Company

(hereinafter "R&H") and others in the Eastern District, No. 05-4988.[3]  On August 18, 2006,

_____

[2]Named as defendants were Rohm and Haas Company, Morgan Lewis & Bockius LLP, Conrad O'Brien Gellman & Rohn, P.C., Robert Vogel, Esquire, Celia Joseph, Esquire, Royce Warrick, Esquire, Michael McLaughlin, Esquire, Wayne Davis, David Gartenberg, Ellen Friedell, Esquire, Jane Greenetz, James D. Pagliaro, Esquire, Paul J. Greco, Esquire, P. Daffodil Tyminski, Esquire, Aretha Delight Davis, Esquire, Nancy Gellman, Esquire, William O'Brien, Esquire, Kelly G. Huller, Esquire, and June McCrory.

[3]Named as defendants were Rohm and Haas Company, Morgan Lewis & Bockius LLP, Conrad O'Brien Gellman & Rohn, P.C., Harkins Cunningham LLP, Liberty Life Assurance Company of Boston, Robert Vogel, Esquire, Celia Joseph, Esquire, Royce Warrick, Esquire, Michael McLaughlin, Esquire, Wayne Davis, David Gartenberg, Ellen Friedell, Esquire, Jane Greenetz, James D. Pagliaro, Esquire, Paul J. Greco, Esquire, P. Daffodil Tyminski, Esquire, Aretha Delight Davis, Esquire, Nancy Gellman, Esquire, William O'Brien, Esquire, Kelly G. Huller, Esquire, June McCrory, John G. Harkins, Jr, Esquire, Eleanor Morris Illoway, Esquire, Steven A. Reed, Esquire, and Colleen Healy Simpson, Esquire.

plaintiff filed a third case against R&H and others in the Eastern District, No. 06-3682.[4]  All

three cases were brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. §1961(1).  The cases have come to be known within the litigation as *Jackson I* (No. 03-

5299), *Jackson II* (No. 05-4988), and *Jackson III* (No. 06-3682).[5]

In *Jackson I*, plaintiff has claimed that defendants altered and manufactured certain

documentary evidence and offered perjured testimony concerning the authenticity of the

documents and/or conspired to do so, all as part of a corrupt effort to gain a judgement in a state

law invasion of privacy case.  The RICO claim was dismissed in June 2005 and following an

appeal to the Third Circuit, the pendent state law claims (including, *inter alia*, abuse of process

and fraud) were transferred to the Philadelphia Court of Common Pleas in April 2007.[6]  On

August 6, 2007, the Philadelphia Court of Common Pleas denied defendants' Preliminary

Objections in their entirety.

In *Jackson II*, plaintiff has claimed that, *inter alia*, defendants improperly interfered with

plaintiff's disability benefits as a device to gain an advantage in the ongoing litigation.  On

September 13, 2007, the district court granted in part and denied in part defendants' various

motions to dismiss, permitting plaintiff's claims pursuant to RICO (predicated upon mail/wire

---

[4]Named as defendants were Rohm and Haas Company, Liberty Life Assurance Company
of Boston, Raj L. Gupta, Robert A. Lonergan, Esquire, Ellen Friedell, Esquire, Marilyn Orr, and
Lori Hamlin.

[5]While plaintiff will refer to *Jackson III* throughout this submission, the district court
signed an Order (dated May 21, 2008) consolidating *Jackson II* and *Jackson III* and Ordering
plaintiff to file a Consolidated Amended Complaint on or before June 11, 2008.

[6]Accordingly, federal case No. 03-5299 and state case April Term 2007, No. 2321 are the
same case.

fraud), RICO (conspiracy), ERISA (breach of fiduciary duty), ERISA (breach of co-fiduciary duty), and ERISA (denial of benefits) to proceed.  *See Jackson v. Rohm and Haas Co.*, 2007 U.S. Dist. LEXIS 67666 (E.D. Pa.  Sept. 13, 2007).  In *Jackson III*, plaintiff has claimed that, *inter alia*, defendants engaged in various predicate offenses, including obstruction of justice, mail/wire fraud, and 18 U.S.C. 1513(e)(retaliation in violation of the Sarbanes-Oxley Act of 2002) in connection with plaintiff's employment and the ongoing state and federal litigation.  On September 5, 2007, the district court granted in part and denied in part defendants' various motions to dismiss, permitting claims pursuant to ERISA (Section 510), fraud, and negligent misrepresentation to proceed, and dismissed the RICO claims based on the pattern element.  *See Jackson v. Rohm and Haas Co.*, 2007 U.S. Dist. LEXIS 65900 (E.D. Pa.  Sept. 5, 2007).

On October 19, 2007, plaintiff moved to amend the Complaint in *Jackson III* to include conduct occurring subsequent to the filing of the original *Jackson III* Complaint.  On February 20, 2008, plaintiff amended the motion to include additional conduct, and in particular, defendants' conduct in preventing plaintiff from obtaining handwriting evidence from defendant Royce Warrick, a lawyer in the General Counsel's office at R&H who is alleged to have authored one of the challenged documents.  On April 21, 2008, the district court denied the motion without prejudice.

On May 21, 2008, the district court signed an Order consolidating *Jackson II* and *Jackson III* and directing plaintiff to file a Consolidated Amended Complaint "alleging all claims for which he has a good faith basis."[7]  The Order noted that "All prior rulings by the Honorable

---

[7]Defendants and claims in the Consolidated Amended Complaint will include, but may not be limited to, those already listed in *Jackson II* and *III*, as well as those identified in the *Jackson III* proposed Third Amended Complaint.

4

Louis H. Pollak as to the viability of claims remain in full force and effect." *See Order of May 21, 2008, Exh. "A".*

**B.     FACTS**

The Harkins firm has entered appearances for all named defendants in *Jackson I-III*, excluding Liberty Life (and its employees Lori Hamlin and Nancy Mayo).  As discussed *infra*, defendants' recent conduct has revealed that the joint representation is improper, and may have been improper from the outset.

**1.     Conflicts of Interest.**

Since the Harkins firm has undertaken representation of all of the R&H defendants, the firm has undertaken simultaneous representation of the following parties under the following circumstances:

> a.     Rohm and Haas Company, a defendant in the original state case and in *Jackson I-III*, and Morgan Lewis & Bockius ("MLB")(and its individual lawyers), which represented R&H in the original state case and is a defendant in the consolidated case.

> b.     Once MLB was sued in connection with its own conduct in the litigation, its interests no longer were identical to those of R&H.  Rather, the allegations against MLB, and MLB's defenses to those allegations, are not the same as its former client, particularly where co-clients Davis and Joseph (represented by MLB in the original state court case) now have testified that they do not recognize the document that MLB contends is Warrick's interview notes.[8]  Further, MLB was sued as an "enterprise" and as

---

[8]As discussed *infra*, Davis and Joseph were presented with each version of the Warrick notes at their May 2008 depositions.  Although Davis and Joseph both have direct knowledge of

part of a "joint enterprise" through which the pattern of racketeering activity was carried out, and therefore, has a discrete self-interest in vindicating itself.

       c.     While the MLB lawyers had a duty to their clients, they also had a separate duty to plaintiff and the Court pursuant to the Rules of Professional Conduct with respect to frauds upon the Court which was not imposed upon R&H and which superceded any duty to their clients. Thus, while R&H and MLB may have faced (some of) the same allegations and claims, the conduct being challenged was not same.

       d.     June McCrory, a defendant in the original state case and in *Jackson I-II*, and Conrad O'Brien Gellman and Rohn (and its individual lawyers), which represented McCrory in the original state case and also was a defendant in *Jackson I-II*. The same reasons that prevented the simultaneous representation of R&H and MLB also prevent the simultaneous representation of McCrory and COGR.

       e.     June McCrory consistently has maintained that she never informed *anyone* at R&H that she was raped by plaintiff, yet the R&H defendants contend that it was McCrory's purported report of a rape that triggered the Company's 1998 investigation. Thus, McCrory's interests are not identical to those of R&H (or anyone else) who contends that a rape occurred or was reported.

       f.     R&H and McCrory, R&H and COGR, MLB and McCrory, and MLB and COGR, even though the positions of the co-clients are not the same concerning the underlying events, both with respect to what McCrory reported, R&H has contended, and the Warrick evidence.[9] Although the Harkins firm jointly represents all of these defendants, some contend that McCrory reported an assault and others (including McCrory herself) deny that an assault ever was reported. Further, some contend that the Warrick evidence is legitimate, even though other R&H defendants (other than those listed in this sub-paragraph) now have come

_____

the true notes, they were unable to identify the versions that R&H contends are Warrick's notes.

    [9]Although COGR represented McCrory during the original state court case, COGR's fees were paid by R&H. The ethical implications of R&H's payment of McCrory's attorney's fees is not the subject of the instant petition, and is not addressed herein.

forward with direct evidence that the purported interview notes are
not the true notes.

       g.     June McCrory and all others who contend that
McCrory reported an assault and/or who support the legitimacy of
any evidence stating or suggesting that McCrory made such a
report.

### 2.      The Answers to the Complaints.

On September 20 (*Jackson III*), 26 (*Jackson I*), and 27 (*Jackson II*), 2007, the Harkins

firm filed an Answer to each of the *Jackson I-III* Complaints.  The Answers further reveal that

the interests of the various defendants represented by the Harkins firm are not identical, or even

consistent.

In each of the Answers, R&H (and certain of the other R&H defendants) expressly

represented Royce Warrick's interview notes as legitimate (and her testimony concerning their

authenticity as truthful), offered them for their truth, and asked plaintiff and the Court to rely

upon them for their truth.  For instance, in the Answer to the *Jackson II* Corrected Second

Amended Complaint, R&H stated:

> Rohm and Haas admits . . . that the original notes that were
> produced on May 23, 2001 are the same as the copy of the notes
> that was produced at Warrick's November 22, 2000 deposition,
> except that the copy produced on November 22, 2000 contained a
> few minor additions made by Warrick after the interview, as she
> testified, and that the notes produced on May 23, 2001 and marked
> as Rohm and Haas Exhibit 64 are not a fraud and are in fact the
> original notes taken by Warrick at the McCrory interview, and that
> Warrick's testimony at trial was truthful and not perjured[.]").

*Answer to Jackson II Corrected Second Amended Complaint at ¶29(j), Exh. "B".*  In the Answer

to the *Jackson III* Amended Complaint, R&H and defendant Friedell (R&H Associate General

Counsel) stated:

> Rohm and Haas and Friedell admit . . .the original notes that were
> produced on May 23, 2001 are the same as the copy that was
> produced at Warrick's November 22, 2000 deposition, except that
> the copy produced on November 22, 2000 contained a few minor
> additions made by Warrick after the interview, as she testified, and
> that the notes produced on May 23, 2001 and marked as Trial
> Exhibit 64 are not a fraud and are in fact the original notes taken by
> Warrick at the McCrory interview, and that Warrick's testimony at
> trial was truthful and not perjured in any respect[.].

*Answer to Jackson III Amended Complaint at ¶33(h), Exh. "C"*; *see also id. at ¶33(j)*("Rohm

and Haas and Friedell admit . . . that [the red felt-tip pen notes] are the true original and are not a

fraud."). In the Answer to the *Jackson I* Amended Complaint, defendants stated:

> Rohm and Haas, Warrick, Friedell, MLB, Pagliaro, Greco, and
> Tyminski admit . . .the original notes that were produced for
> inspection on May 23, 2001 are the same as the photocopy that was
> produced at Warrick's November 22, 2000 deposition, except that
> the copy produced on November 22, 2000 contained a few minor
> additions made by Warrick after the interview, as she testified.
>
> .....................
>
> [T]he notes produced for inspection on May 23, 2001 and marked
> as Rohm and Haas Exhibit 64 are not a fraud and are in fact the
> original notes taken by Warrick at the McCrory interview.
>
> .....................
>
> [T]he Warrick trial testimony and arguments made on behalf of
> defendants concerning it and the exhibits referred to in such
> testimony and testimony itself concerning the exhibits were
> truthful and accurate in all respects and were not intended to, nor
> did they, deceive or defraud the court in any manner[.]

*Answer to Jackson I Amended Complaint at ¶¶118, 119, 122, Exh. "D".*

However, the Harkins firm also represents defendants David Gartenberg, Celia Joseph,

Wayne Davis, and Michael McLaughlin, all of whom were participants in the original

investigation of the McCrory matter, and have direct knowledge of Warrick's original notes.[10]

Gartenberg was in the room while McCrory was being interviewed by Warrick.  *N.T. 10/03/01*

*(p.m.) at 21:11-22:10 (trial testimony of David Gartenberg), Exh. "E"*.  Joseph also was in the

room during the interview, sat across the table from Warrick and had an unobstructed view of

Warrick's notepad (which Warrick had placed on the table in front of her) as Warrick took the

notes.[11]  *Joseph Dep. 05/15/08 at 103:23-105:14, Exh. "F"*.  Davis testified that he reviewed

Warrick's notes in preparation for his deposition in the original state case.  *Davis Dep. 12/07/00*

*at 67:17-24, Exh. "G"*.  Warrick testified that she gave her notes to Michael McLaughlin prior to

McLaughlin and Davis' interview of plaintiff in July 1998.  *N.T. 10/04/01 (a.m.) at 62:19-63:5*

*(trial testimony of Royce Warrick), Exh. "H"*; *see also N.T. 10/05/01 (a.m.) at 28:10 (trial*

*testimony of Royce Warrick), Exh. "I"*.  Therefore, even though all four individuals had direct

knowledge of the form and/or substance Warrick's notes, all answered the same allegations:

> After reasonable investigation, all other defendants are without
> knowledge or information sufficient to form a belief as to the truth
> of the averments of Paragraph [118, 199, and 122], and on that
> basis they are therefore deemed denied.

---

[10]The Harkins firmn also represents Jane Greenetz, a Rohm and Haas Company paralegal, and the person alleged to have located the original red felt-tip pen "original" notes when they could not be located.

[11]Importantly, it is R&H's position that the red felt-tip pen "original" notes were written in red felt-tip pen ink on (letter-sized) white notebook paper.  *See Exh. "C"*.  However, at her May 15, 2008 deposition, Joseph testified that she could not recall whether the notepad Warrick used to take the interview notes was letter or legal size.  *Joseph Dep. (05/15/08) at 99:17-100:4, Exh. "F"*.  Notably, Joseph testified that she met with defense counsel the day prior to her deposition, and reviewed the same versions of Warrick's notes that were identified as Exhibits at the deposition, yet still was unable to identify any of the documents.

*Answer to Jackson I Amended Complaint at ¶¶118, 119, 122, Exh. "D"*.  Thus, the Harkins firm

has filed Answers on behalf of persons/institutions who were: a) not directly involved in the

original investigation, stating that the Warrick notes are authentic and Warrick's testimony with

respect to the notes truthful; and b) directly involved in the original investigation, and who have

direct knowledge with respect to the true notes, but who deny knowledge or information

sufficient to respond to plaintiff's fraud allegations.

Thus, the interests of these various constituencies are not identical, or even consistent.

Further, Gartenberg, Joseph, Davis and McLaughlin all have *seen* Warrick's notes, and therefore

*know* whether the documents from the November 2000 deposition and the red felt-tip pen

"original" are the true notes (i.e., authentic).  Therefore, with respect to Paragraph Nos. 118, 119,

and 122 of the *Jackson I* Amended Complaint, the Harkins firm could not ethically file an

Answer for each of them other than an admission that the documents were Warrick's true notes

(i.e., authentic), or a denial that they were not the true notes (i.e., not authentic).[12]

---

[12]Plaintiff hired Robert J. Phillips, a forensic document examiner, to prepare a report to
support plaintiff's petition to re-open discovery following notice that the "original" notes had
been located.  On June 4, 2001, Phillips issued a preliminary report stating that, contrary to
Warrick's deposition testimony and affidavit, the two versions of the interview notes were not
identical.  Specifically, Phillips stated that based upon a visual examination of the copies of the
notes produced at the deposition and of the alleged original, he could determine that: a)  certain
portions of the document were materially different from other portions, suggesting that they were
written at a different time; b) portions of the document may have been intentionally cut off; c) the
copy introduced at the deposition was materially different than the alleged original; d) the large
blank spaces on certain pages suggested that certain information was covered or removed so as to
not be copied; and e) contrary to Warrick's claim that all of the writing was hers, "strong
differences in the appearance of the writing suggest multiple authorship."  Phillips' report has
never been refuted by an expert for defendants.

### a.      The Answer of June McCrory.

The Harkins firm's transgressions continued (or arguably, reached new heights) with

respect to the Answer of June McCrory.  In the Answer to the *Jackson I* Complaint, it states:

> McCrory avers that the only information and knowledge she has
> regarding the averments of Paragraph 122 is the content of what
> she reported (to which she testified) which is consistent with what
> she heard and saw regarding Warrick's notes in Warrick's trial
> testimony (as reflected in the trial record).

*See e.g. Answer to Jackson I Amended Complaint at ¶¶118, 119, 122, Exh. "D"*.  Warrick

contends that McCrory reported a rape.  However, McCrory testified at the original state court

trial that she never informed *anyone* at R&H that plaintiff had raped her.  *See N.T. 10/02/01*

*(a.m.) at 27:14-27:18, Exh. "J" (trial testimony of June McCrory)*("Q:  It is correct, is it not, that

you never stated to any Rohm and Haas official that you had been raped?  A:  That is correct.");

*see also id. at 28:10, Exh. "J"* (Q: And it's also correct that no Rohm and Haas official ever

asked you whether Mr. Jackson had raped you?  A:  Again, I don't remember that question.").[13]

It is *impossible* for the Harkins firm to jointly represent these two constituencies, or to

obtain a proper waiver of the conflict because, *inter alia*, the firm is required to advocate

opposite positions on the same issue (i.e., that a rape was reported, and that no rape ever was

reported).  Further, any Answer on behalf of McCrory other than an *admission*, or that is

completely consistent with McCrory's admission at that original state court trial that she *never*

reported that she had been raped or assaulted, is improper and reveals the unwaivable conflict

---

[13]*See also N.T. 10/02/01 (a.m.) at 28:14, Exh. "J" (testimony of June McCrory)*("Q:  Isn't
it correct that at that point in time yopu weren't even thinking about it in those terms, meaning
you weren't even thinking about the events in in question as having been a rape?  A: That is
fair.").

between these two factions of co-clients.[14]

### 3.   The Davis and Joseph Depositions (Part I).

On May 7, 2008, plaintiff took the deposition of Wayne Davis in *Jackson I.*  At the

deposition, Davis was presented with three versions of Royce Warrick's interview notes: 1) a

photocopy of the version produced at Warrick's November 2000 deposition; b) a photocopy of

the red felt-tip pen "original" notes; and c) a color photocopy of pictures of two pages of the red

felt tip pen "original" notes.  In each instance, Davis was unable to identify the document.  *Davis*

*Dep. (05/07/08) at 26:21-28:21, 78:9-80:4, Exh. "K".*  As discussed *supra*, Davis was unable to

identify the documents even though he previously testified that used Warrick's notes to prepare

for his deposition in the original state court case.  *Davis Dep. (12/07/00) at 67:17-24, Exh. "G".*

On May 15, 2008, plaintiff took the deposition of Celia Joseph in *Jackson I.*  At the

deposition, Joseph was presented with the same three versions of Royce Warrick's interview

notes.  In each instance, Joseph was unable to identify the document and/or the handwriting on

the document.  *Joseph Dep. (05/15/08) at 128:19-131:24, 132:10-135:6, 135:-138:9, Exh. "F".*

Joseph was unable to identify the documents even though she testified that: a) sat across the table

from Warrick and had an unobstructed view of Warrick's notepad (which Warrick had placed on

the table in front of her) as Warrick took the notes; and b) she previously testified that she was

familiar with Warrick's handwriting.  *Joseph Dep. (05/15/08) at 103:23-105:14, Exh. "F"*;

---

[14]There is an inherent conflict in representing both an employer (R&H) and employee
(McCrory) in a subsequent legal proceeding arising from an employer investigation.  This is
particularly so where, as here, there is a dispute between *them* concerning what occurred, i.e.,
whether the employee made a report of an assault.

*Joseph Dep. (11/30/00) at 152:10-153:19, Exh. "L".*

### 4.     The Davis and Joseph Depositions (Part II).

On January 12, 2004, the Harkins firm entered an appearance for most of the *Jackson I*
defendants, including Wayne Davis and Celia Joseph.  However, at their May 2008 depositions,
both Wayne Davis and Celia Joseph testified that they had not seen the *Jackson I* Complaint
(filed in September 2003) until the Fall of 2007, at or near the time defendants' Answer to the
*Jackson I* Amended Complaint was due to be filed.[15]  *Davis Dep. (05/07/08) at 30:15-35:18,
Exh. "K"*; *Joseph Dep. (05/15/08) at 124:19-126:19, 156:11-160:1, Exh. "F".*  Davis testified
that did not know the claims against him, or even that the Complaint pertained to the authenticity
of the Warrick notes.  *Davis Dep. (05/07/08) at 29:14-24, Exh. "K"* (unaware that lawsuit
pertained to authenticity of Warrick evidence); *id. at 30:7, Exh. "L"* (unaware of claims in case
and stating to plaintiff's counsel "Maybe you'd better tell me.").  And, Davis provided the
following answer to the following question:

> BY MR. SILVERBERG:
>
>      Q:  Did someone at Harkins Cunningham review the
> substantive allegations of this Complaint with you?  You can
> answer that question.
>
>      MS. SIMPSON:  Did he review this document with
> counsel?
>
>      MR. SILVERBERG:  That's all I want to know.
>
>      MS. SIMPSON:  You can answer that question.

---

[15]Both Davis and Joseph are represented by the Harkins firm, which accepted service on
their behalf.

THE WITNESS:  No.

*Davis Dep. (05/07/08) at 35:8-18, Exh. "K".*  As discussed *infra*, this represents a severe breach of the firm's various duties to its clients.  Further, it is not possible for the Harkins firm to obtain a proper waiver of any conflicts when a client has not seen the Complaint, his lawyers have not reviewed it with him, and he does not have a proper understanding of the parties, allegations and claims.

### 5.     Obstructive Conduct.

The Harkins firm has engaged in a pattern and practice of obstructive conduct, and more generally, a persistent interference with the due administration of justice, all of which has been intended to prevent plaintiff from obtaining the evidence necessary to prepare his cases for trial. The pattern of conduct was often carried out in open court in the form of direct misrepresentations of fact or law, and shows that litigation misconduct is, in fact, defendants' regular way of doing business.

### a.     The Deposition and Handwriting Exemplar of Royce Warrick.

### i.     The First Failure to Appear.

On June 28, 2007, plaintiff served a Notice of Deposition for defendant Royce Warrick, Esquire, the purported author of the handwritten notes of the interview of defendant June McCrory.[16]  The purpose of the deposition was to obtain a handwriting exemplar and certain

---

[16]The exhibits for this section can be found in Part III(D), *infra*.

related testimony.[17]  On August 20, 2007, nearly two months after service of the Notice of

Deposition, Warrick failed to appear for her duly noticed deposition.

As discussed *infra*, beginning on or about June 28, 2007 and continuing through

November 7, 2007, plaintiff repeatedly sought to obtain dates, to schedule, and otherwise to

depose Royce Warrick and to obtain a handwriting exemplar consistent with the Notice of

Deposition served on June 28, 2007.  However, the Harkins firm steadfastly failed and refused to

cooperate in scheduling the deposition/exemplar and, in fact, seemingly did everything in their

power to prevent the proceeding from taking place.

### ii.      The Order of September 11, 2007.

On September 11, 2007, Judge Manfredi granted plaintiff's motion to compel the Warrick

deposition/exemplar.  In granting the motion, the Court of Common Pleas stated:

> It is further ORDERED that:
>
> 1.      Upon further application to the Court, defendants shall pay to
> plaintiff his reasonable attorney's fees and costs associated with the preparation
> and filing of the instant motion to compel depositions; and
>
> 2.      Defendants shall be subject to further sanction(s) for failure to
> comply with this Order and/or the Pennsylvania Rules of Civil Procedure.

### iii.     The Second Failure to Provide an Exemplar.

On November 7, 2007, pursuant to the original Notice of Deposition, Royce Warrick

---

[17]The Notice of Deposition and accompanying correspondence made clear that the
deposition would be limited in scope, and was "not for purposes of obtaining testimony in
connection with other matters related to these proceedings, which will occur at a separate
proceeding pursuant to a separate Notice of Deposition."

appeared at plaintiff counsel's office to provide a handwriting exemplar and related testimony. Although Warrick provided certain testimony, defense counsel would not permit the exemplar to proceed because the instructions for the exemplar were going to be provided by plaintiff's forensic document examiner, and not plaintiff's counsel.

### iv.    The Greenetz Deposition/Exemplar.

On October 25, 2007, plaintiff served a Notice of Deposition for defendant Jane Greenetz for purposes of obtaining a handwriting exemplar and related testimony.  Greenetz is the purported author of an affidavit, dated June 14, 2001, in which Greenetz claims to have located Warrick's original notes when the notes allegedly were misplaced.

On November 15, 2007, pursuant to the Notice of Deposition, plaintiff obtained a handwriting exemplar and related testimony from Greenetz.  Although the circumstances of the Greenetz deposition were identical to those of the Warrick deposition, and although Greenetz was represented by the same counsel (i.e., Eleanor Morris Illoway, Esquire, of the Harkins firm), defense counsel permitted the Greenetz deposition to go forward even though the instructions for the exemplar were provided by plaintiff's forensic document examiner, and not plaintiff's counsel.[18]

### v.    The Order of December 4, 2007.

On December 4, 2007, the Hon. Paul P. Panepinto granted plaintiff's Motion for Sanctions for, *inter alia*, Defendants' Violation of the Order of September 11, 2007 Compelling

---

[18]As discussed *supra*, this was the basis for failing to proceed with the Warrick exemplar.

the Handwriting Exemplar of Defendant Royce Warrick.  In granting the motion, the Court

Ordered that:

> 1.      Royce Warrick shall provide forthwith: a) a
> handwriting exemplar to plaintiff, or plaintiff's designated
> representative, including plaintiff's forensic document examiner;
> and b) at least six normal course of business handwriting samples
> from the period 1998-2001;
>
> 4.      Defendants shall be subject to further sanction(s) for
> failure to comply with this Order and/or the Pennsylvania Rules of
> Civil Procedure.

On December 10, 2007, Royce Warrick provided a handwriting exemplar, but defendants

failed to produce any normal course of business handwriting samples which, *inter alia*, prevented

plaintiff's expert from using the samples as part of the exemplar.[19]


### 6.      The Harkins Firm Engaged in an Intentional, Persistent, Longstanding Failure to Cooperate.

As discussed both *supra* and *infra*, the Harkins firm has engaged in an intentional,

persistent pattern of conduct intended to impede plaintiff's ability to prepare his case for trial,

and more generally, to interfere with the due administration of justice.  Whether the conduct is

the result of the firm's many conflicts, its own self-interest, or simply is the way the Harkins firm

conducts its practice, such conduct is directly contrary to the Rules of Professional Conduct, and

the firm's obligations to plaintiff and the Court.

---

[19]Plaintiff specifically had requested that Warrick bring the normal course writings with
her to the exemplar.

### 7.    Improper Assertion of Attorney-Client Privilege.

As discussed *infra*, the Harkins firm repeatedly asserted the attorney-client privilege in the depositions of Wayne Davis and Celia Joseph, the first two *Jackson I* depositions where the primary purpose of the proceeding was to obtain testimony (as opposed to physical evidence). However, "A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help in the law.  He must let the truth be told."  *In re Investigating Grand Jury No. 88-00-3505*, 593 A.2d 402, 407 (Pa. 1991), *citing Nadler v. Warner Company*, 321 Pa. 139, 143-144 (1936)(internal cites omitted).

### 8.    Disciplinary Violations.

As discussed *infra*, consistent with its obstructive conduct and overall interference with the due administration of justice, the Harkins firm has engaged in numerous violations of the Pennsylvania Rules of Professional Conduct.  These violations are disqualifying, and further, a Rule to Show Cause should be issued as to why the Harkins firm's lawyers who have engaged in the violations should not be referred to the Disciplinary Board of the Supreme Court of Pennsylvania.

## III.    ARGUMENT

### A.    THE HARKINS FIRM HAS AN UNWAIVABLE CONFLICT OF INTEREST THAT MANDATES DISQUALIFICATION

Rule 1.7 of the Rules of Professional Conduct permits waiver of a potential conflict of

interest where "each affected client gives informed consent."[20]/[21]   However, "in cases of very

serious or irreconcilable conflicts, the conflict may be unwaivable."   *Hesling v. Avon Grove Sch.*

*Dist.*, 2007 U.S. Dist. LEXIS 24209, at *10 (E.D. Pa.  April 2, 2007)(Pollak, J.).

_____

[20]The Local Rules of the United States District Court for the Eastern District of
Pennsylvania incorporate the Pennsylvania Rules of Professional Conduct, which the Supreme
Court of Pennsylvania has adopted.  *In re Pressman-Gutman Co.,* 459 F.3d 383, 388 n.6 (3d Cir.
2006).

[21]Rule 1.7 of the Pennsylvania Rules of Professional Conduct states:

Rule 1.7. Conflict of Interest:  Current Clients

(a) Except as provided in paragraph (b), a lawyer shall not
represent a client if the representation involves a concurrent
conflict of interest.  A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse
to another client; or

(2) there is a significant risk that the representation of one
or more clients will be materially limited by the lawyer's
responsibilities to another client, a former client or a third person
or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict
of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be
able to provide competent and diligent representation to each
affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a
claim by one client against another client represented by the lawyer
in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent.

*Pa.R.P.C. 1.7.*

A conflict of interest may be so severe as to impede the fair operation of the courts and preclude continued joint representation, regardless of any waiver. *Hesling*, 2007 U.S. Dist. LEXIS 24209, at *12, *citing United States v. Jones*, 381 F.3d 114, 120 (2d Cir. 2004)(finding a "*per se* unwaivable conflict of interest" where "the attorney's self-interest in avoiding criminal charges or harm to his reputation were enough to influence every aspect of his representation of defendant"); *Sapienza v. New York News, Inc.*, 481 F. Supp. 676, 680 (S.D.N.Y. 1979)(finding conflict unwaivable where it was "far from obvious that [counsel] could adequately represent both [a defendant] and the plaintiffs"). "[C]oncern about the 'confidence and respect of the community towards its bench and bar' supports disqualification of counsel in some cases, even where the parties have consented to the multiple representation." *Sapienza*, 481 F. Supp. at 680, *c.f. Hesling*, 2007 U.S. Dist. LEXIS 24209, at *12. Further, "A court need not accept a client's waiver of the conflict, not only with respect to an actual conflict of interest that is obvious before trial, but also in the more common situation of a potential conflict." *United States v. Merlino*, 349 F.3d 144, 152 n.3 (3d Cir. 2003), *citing Wheat v. United States*, 486 U.S. 153, 163 (1988). As discussed *supra*, the conflicts between the co-clients are so severe that the Harkins firm cannot continue the joint representation, even if informed consent were properly obtained. Further, the Harkins firm's increasing "self-interest" also prevents the joint representation.

1. **The Harkins Firm Cannot Jointly Represent Clients Who Both Admit and Deny That the Warrick Documents Are Authentic.**

   a. **The Answers to the Complaints Demonstrate an Irreconcilable, Unwaivable Conflict of Interest.**

As discussed *supra*, the Harkins firm jointly represents two constituencies of clients in

the *Jackson I-III* cases - those who admit and those who deny that the Warrick documents are authentic, positions which are in direct conflict.  In fact, any position the Harkins firm takes with respect to the evidence would be directly at odds with the interests of one or more of its clients.  Whether a fraud was perpetrated on plaintiff and the Court goes to the very heart of plaintiff's abuse of process and fraud claims in *Jackson I*, and is highly relevant to plaintiff's various retaliation and other claims in *Jackson II* and *III*.

Under the circumstances, such a conflict is so severe as to impede the fair operation of the courts and preclude continued joint representation, regardless of any waiver.  *Hesling*, 2007 U.S. Dist. LEXIS 24209, at *12.

> **2.      The Harkins Firm Cannot Jointly Represent Clients Who Both Admit and Deny That June McCrory Reported That She Was Raped.**
>
> > **a.      The Answers to the Complaints Demonstrate an Irreconcilable, Unwaivable Conflict of Interest.**

As discussed *supra*, the Harkins firm jointly represents clients who both maintain that June McCrory reported that she was sexually assaulted by plaintiff, and who deny that McCrory made any such report.  The Harkins firm cannot simultaneously advocate the interests of these two constituencies because their positions are in direct conflict.  Even if McCrory now claims that she made such a report, any such claim would be directly contrary to the position that McCrory maintained throughout the original state court case, which would further weigh against joint representation.

### B. THE HARKINS FIRM HAS ENGAGED IN LEGAL VIOLATIONS AS PART OF THE REPRESENTATION OF ITS CLIENTS

#### 1. The Failure to Provide a Handwriting Exemplar, and the Production of Incomplete, Illegible, and Redacted Normal Course of Business Writings, Constitutes an Obstruction of Justice.

It is manifest that the failure to provide a handwriting exemplar, which is physical evidence, constitutes an obstruction of justice.[22]  The Ninth Circuit has stated:

> There are few better examples of a classic obstruction of justice than a defendant who refuses to give handwriting samples when compelled by a subpoena.

*United States v. Flores*, 172 F.3d 695, 701 (9th Cir. 1999), *citing United States v. Valdez*, 16 F.3d 1324, 1335 (2d Cir. 1994); *United States v. Reyes*, 908 F.2d 281, 290 (8th Cir. 1990) (refusal to provide handwriting exemplar effectively concealed the defendant's handwriting style and amounted to an obstruction of justice because handwriting style material evidence at trial). Moreover, an initial refusal followed by compliance still constitutes obstruction.  *United States v. Taylor*, 88 F.3d 938, 944 (11th Cir. 1996)("Taylor's repeated refusals to supply handwriting exemplars, and his effort to disguise his handwriting when he did supply them, constitute an attempt to impede the prosecution of this case.").  *See also United States v. Ruth,* 65 F.3d 599, 608 (7th Cir.1995)(upholding obstruction of justice enhancement where defendant twice refused to comply with court order to provide handwriting exemplars); *United States v. Yusufu,* 63 F.3d 505, 514-15 (7th Cir. 1995)(upholding obstruction of justice enhancement where defendant supplied disguised handwriting exemplars); *United States v. Reyes,* 908 F.2d 281, 290 (8th Cir. 1990)(upholding enhancement where defendant refused to comply with court order to provide

---

[22]Similarly, disguising an exemplar, submission of a misleading sample, and disguising a sample for purposes of making a comparison more difficult, also are an obstruction of justice.

handwriting exemplars).

As discussed *supra* and *infra*, the Harkins firm participated in an intentional, concerted effort to block plaintiff from obtaining handwriting evidence from Royce Warrick.  *See Part D, infra*.  Such conduct cannot be reconciled with the firm's duties and responsibilities under the Pennsylvania Rules of Professional Conduct, and to plaintiff and the Court.  *See Part C, infra*.  Further, in *Jackson III*, plaintiff now has advanced claims of obstruction of justice related to the failure to provide the handwriting evidence as required.  Therefore, notwithstanding the other grounds in favor of disqualification, the firm has a self-interest related to its role in the conduct that now is the subject of plaintiff's obstruction of justice claims.


### C.    THE HARKINS FIRM HAS VIOLATED THE RULES OF PROFESSIONAL CONDUCT

"An attorney who faces criminal or disciplinary charges for his or her actions in a case will not be able to pursue the client's interests free from concern for his or her own."  *Merlino*, 349 F.3d at 151.  As discussed *infra*, the Harkins firm lawyers have violated multiple Rules of Professional Conduct during the joint representation.[23]


### 1.    Rule 1.2:  Scope of Representation and Allocation of Authority Between Lawyer and Client.

Rule 1.2(a) states that "[A] lawyer shall abide by a client's decisions concerning the

---

[23]The Rules of Professional Conduct are interrelated, and conduct which violates a particular Rule may also violate other Rules.  Therefore, the fact that particular conduct is discussed in the context of a particular Rule should not be construed as a waiver of any argument or claim that the conduct may also constitute a violation of other Rule(s).

objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are pursued."

Wayne Davis and Celia Joseph both testified that the first time they saw the Complaint in *Jackson I* was the Fall of 2007, even though the case was filed in September 2003 and an Amended Complaint was filed in February 2004.  At the time of his May 2008 deposition, Davis was unaware of the claims against him, and asked plaintiff's counsel to explain them to him. *Davis Dep. (05/07/08) at 29:14-24, Exh. "K"* (unaware that lawsuit pertained to authenticity of Warrick evidence); *id. at 30:7, Exh. "K"* (unaware of claims in case and stating to plaintiff's counsel "Maybe you'd better tell me.").  By May 2008, *Jackson I* had been filed, amended, dismissed by the district court, appealed to (and decided by) the Third Circuit, and transferred to the Philadelphia Court of Common Pleas which overruled defendants' Preliminary Objections. Further, defendants and/or defense counsel repeatedly had been sanctioned based upon their litigation misconduct, ultimately leading plaintiff to allege in *Jackson III* that the conduct constituted an obstruction of justice.

Under the circumstances, it is *impossible* that the Harkins firm properly complied with the requirements of Rule 1.2 where, at least as to defendants Davis and Joseph whose depositions were taken in May 2008, certain co-clients had not even seen the Complaint against them until approximately four years after it was filed.

### 2. Rule 1.2:  Scope of Representation and Allocation of Authority Between Lawyer and Client.

Rule 1.2(d) states that "A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent[.]"  In May 2008, plaintiff took the

depositions of both Wayne Davis and Celia Joseph, two of the original investigators in the McCrory matter.   Both Davis and Joseph were presented with three versions of the notes: a) a photocopy of the November 2000 version; b) a photocopy of the red felt-tip pen "original" version; and c) a color photocopy of a photograph of two pages of the red felt-tip pen "original" version.  Although both Davis and Joseph previously had seen Warrick's original notes (and/or a copy thereof) and/or were familiar with Warrick's handwriting, both testified that they had not previously seen any of the three versions and/or did not recognize the handwriting.[24]

Since Davis and Joseph testified that the version(s) of the notes were not the true notes, the Harkins firm possesses information that evidence being advanced as legitimate is actually fraudulent.[25]  This may explain why the Complaint in *Jackson I* was withheld from Davis and Joseph (and perhaps others) until the Fall of 2007, approximately four years after the Complaint was first filed.  This improper withholding of information enabled the Harkins firm (on behalf of certain co-clients) to engage in the joint representation, and to undertake a course of conduct on behalf of all co-clients, but which only was in the interests of some of them.  At a minimum, a client does not have the knowledge and cannot consent to a course of action when he/she does not have a proper understanding of the allegations/claims against him/her.  Further, there can be no proper waiver of any actual or potential conflicts.  *United States v. Fumo*, 504 F. Supp. 2d 6,

---

[24]The Harkins firm also possesses, and has attached as an exhibit to certain submissions in the *Jackson* cases, a copy of the unrefuted expert report of July 16, 2001 Robert J. Phillips, plaintiff's forensic document examiner.  In his report, Phillips identifies several aspects of the November 2000 notes which suggest that the document has been altered from its original form.

[25]Once having obtained information from a client that the client of a co-client is perpetrating a fraud, the Harkins firm *must* take immediate remedial measures, including disclosure of the fraud to the Court and/or withdrawal.  *See infra.*

30 (E.D. Pa. 2007)("'[i]nformed consent' denotes the consent by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.").

### 3.  Rule 1.3:  Diligence.

Rule 1.3 states that "A lawyer shall act with reasonable diligence and promptness in representing a client."  For the same reasons that the Harkins firm violated Rule 1.2, the firm violated Rule 1.3.

### 4.  Rule 1.4:  Communication.

Rule 1.4 states, in pertinent part,

> a) "A lawyer shall:
>
> 3) keep the client reasonably informed about the status of the matter;
>
> b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

*Pa.R.P.C. 1.4.*  The Explanatory Comment to Rule 1.4 states:

> Reasonable communication between the lawyer and the client is necessary for the client effectively to participate in the representation.
>
> ..........................
>
> The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so.  Adequacy of communication depends in part on the kind of advice or assistance that is involved.  ...  In litigation a lawyer should explain the

26

> general strategy and prospects of success and ordinarily should
> consult the client on tactics that are likely to result in significant
> expense or to injure or coerce others.  ...  The guiding principle is
> that the lawyer should fulfill reasonable client expectations for
> information consistent with the duty to act in the client's best
> interests, and the client's overall requirements as to the character of
> representation.  In certain circumstances, such as when a lawyer
> asks a client to consent to a representation affected by a conflict of
> interest, the client must give informed consent, as defined in Rule
> 1.0(e).

*Pa.R.P.C. 1.4. Explan. Cmt. 1, 5.*  At a minimum, the requirements of Rule 1.4 make clear that a

lawyer may not withhold a lawsuit from the client, fail to review the allegations and claims with

the client, fail to explain actual or potential conflicts between co-clients, and to obtain a proper

waiver of those conflicts, assuming *arguendo* such conflicts can be waived in the first instance.

Importantly:

> A lawyer may not withhold information to serve the lawyer's own
> interests or convenience or the interests or convenience of another
> person.

*Pa.R.P.C. 1.4. Explan. Cmt. 7.*  Yet, this is precisely what has occurred here.  Whether

information was withheld for the benefit of other clients and/or the Harkins firm's business

interest in providing legal services to those clients, the Harkins firm's self-interest (e.g. in its

reputation, or avoiding criminal or ethical violations), or for some other reason, the firm was

strictly prohibited from withholding the information.

### 5. Rule 1.6:  Confidentiality of Information

Rule 1.6 (pertaining to confidentiality of information) is applicable.  The Explanatory

Comment states:

> [A] lawyer may have been innocently involved in past conduct by a

> client that was criminal or fraudulent.  In such a situation, the
> lawyer did not violate Rule 1.2(d).  However, if the lawyer's
> services were made an instrument of the client's crime or fraud, the
> lawyer has a legitimate and overriding interest in being able to
> rectify the consequences of such conduct.  Rule 1.6(c)(3) gives the
> lawyer professional discretion to reveal information relating to the
> representation to the extent necessary to accomplish rectification.

*Pa.R.P.C. 1.6 Explan. Cmt. 13*.  Here, if the Harkins firm somehow was unaware that it was

being utilized to perpetrate a fraud, and/or was concerned that its duties to its clients superceded

its duties to the Court, Rule 1.6 (among others) specifically addresses such a concern.  Even so,

the Harkins firm still has taken no measures with respect to its clients' conduct, or its own.


### 6.    Rule 1.7:  Conflict of Interest:  Current Clients.

Rule 1.7 states:

> (a)  Except as provided in paragraph (b), a lawyer shall not
> represent a client if the representation involves a concurrent
> conflict of interest.  A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly
> adverse to another client; or
>
> (2) there is a significant risk that the representation of
> one or more clients will be materially limited by the lawyer's
> responsibilities to another client, a former client or a third person
> or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict
> of interest under paragraph (a), a lawyer may represent a client if:
>
> (1) the lawyer reasonably believes that the lawyer will
> be able to provide competent and diligent representation to each
> affected client;
>
> (2) the representation is not prohibited by law;
>
> (3) the representation does not involve the assertion of a

28

claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent.

*Pa.R.P.C.1.7.*   As the Third Circuit has stated, an attorney may undertake joint representation of multiple clients only where the interests of the attorney's clients are identical, or nearly so:

> [B]ecause co-clients agree to share all information related to the matter of common interest with each other and to employ the same attorney, their legal interests must be identical (or nearly so) in order that an attorney can represent them all with the candor, vigor, and loyalty that our ethics require.

*In re Teleglobe Communications*, 493 F.3d 345, 366 (3d Cir. 2007), *citing FDIC v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000).  The Explanatory Comment to Rule 1.7 provides a detailed roadmap with respect to the issues presented by the joint representation, and their resolution. Thus, the Explanatory Comment is quoted and discussed at length.

As a general matter, "Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.  Concurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person or from the lawyer's own interests." *Pa.R.P.C. 1.7 Explan. Cmt. 1.*  With respect to resolution of conflicts:

> Resolution of a conflict of interest problem under this Rule requires the lawyer to: 1) clearly identify the client or clients; 2) determine whether a conflict of interest exists; 3) decide whether the representation may be undertaken despite the existence of a conflict, i.e., whether the conflict is consentable; and 4) if so, consult with the clients affected under paragraph (a) and obtain their informed consent. The clients affected under paragraph (a) include the clients referred to in paragraph (a)(1) and the clients whose representation might be materially limited under paragraph (a)(2).

*Pa.R.P.C. 1.7 Explan. Cmt. 2.*  Concerning conflicts arising after representation has been

29

undertaken:

> If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b). See Rule 1.16. Where more than one client is involved, whether the lawyer may continue to represent any of the clients is determined both by the lawyer's ability to comply with duties owed to the former client and by the lawyer's ability to represent adequately the remaining client or clients, given the lawyer's duties to the former client. See Rule 1.9. See also Comments [5] and [29].

*Pa.R.P.C. 1.7 Explan. Cmt. 4.*[26]  Where a client's fees are being paid by a co-client:

> A lawyer may be paid from a source other than the client, including a co-client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client. See Rule 1.8(f). If acceptance of the payment from any other source presents a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's own interest in accommodating the person paying the lawyer's fee or by the lawyer's responsibilities to a payer who is also a co-client, then the lawyer must comply with the requirements of paragraph (b) before accepting the representation, including determining whether the conflict is consentable and, if so, that the client has adequate information about the material risks of the representation.

*Pa.R.P.C. 1.7 Explan. Cmt. 13.*  Concerning consent notwithstanding a conflict:

> Ordinarily, clients may consent to representation notwithstanding a conflict. However, as indicated in paragraph 1.7(b), some conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask for such agreement or provide representation on the

---

[26]A conflict of interest may exist before representation is undertaken, in which event the representation must be declined, unless the lawyer obtains the informed consent of each client under the conditions of paragraph (b). To determine whether a conflict of interest exists, a lawyer should adopt reasonable procedures, appropriate for the size and type of firm and practice, to determine in both litigation and non-litigation matters the persons and issues involved. Ignorance caused by a failure to institute such procedures will not excuse a lawyer's violation of this Rule. *Pa.R.P.C. 1.7 Explan. Cmt. 3.*

basis of the client's consent. When the lawyer is representing more than one client, the question of consentability must be resolved as to each client.

Consentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients are permitted to give their informed consent to representation burdened by a conflict of interest. Thus, under paragraph (b)(1), representation is prohibited if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation. See Rule 1.1 (competence) and Rule 1.3 (diligence).

*Pa.R.P.C. 1.7 Explan. Cmt. 14-5*.  Concerning informed consent:

Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client.  *See* Rule 1.0(e) (informed consent). The information required depends on the nature of the conflict and the nature of the risks involved. When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege and the advantages and risks involved. See Comment, paragraphs [30] and [31] (effect of common representation on confidentiality).

*Pa.R.P.C. 1.7 Explan. Cmt. 18*.  Concerning joint representation:

In considering whether to represent multiple clients in the same matter, a lawyer should be mindful that if the common representation fails because the potentially adverse interests cannot be reconciled, the result can be additional cost, embarrassment and recrimination.  Ordinarily, the lawyer will be forced to withdraw from representing all of the clients if the common representation fails.  In some situations, the risk of failure is so great the multiple representation is plainly impossible.

*Pa.R.P.C. 1.7 Explan. Cmt. 29*.  The Explanatory Comment continues:

As to the duty of confidentiality, continued common representation will almost certainly be inadequate if one client asks the lawyer not to disclose to the other client information relevant to the common

representation. This is so because the lawyer has an equal duty of
loyalty to each client, and each client has the right to be informed
of anything bearing on the representation that might affect that
client's interests and the right to expect that the lawyer will use that
information to that client's benefit. *See* Rule 1.4. The lawyer
should, at the outset of the common representation and as part of
the process of obtaining each client's informed consent, advise
each client that information will be shared and that the lawyer will
have to withdraw if one client decides that some matter material to
the representation should be kept from the other.

*Pa.R.P.C. 1.7 Explan. Cmt. 31.* The Explanatory Comment continues:

When seeking to establish or adjust a relationship between clients,
the lawyer should make clear that the lawyer's role is not that of
partisanship normally expected in other circumstances and, thus,
that the clients may be required to assume greater responsibility for
decisions than when each client is separately represented. Any
limitations on the scope of the representation made necessary as a
result of the common representation should be fully explained to
the clients at the outset of the representation. *See* Rule 1.2(c).

*Pa.R.P.C. 1.7 Explan. Cmt. 32.* "Subject to the above limitations, each client in the common

representation has the right to loyal and diligent representation[.]" *Pa.R.P.C. 1.7 Explan. Cmt.

33.*

Rule 1.7 identifies issues that clearly were present at the outset of the joint representation.

The interests of the co-clients were not identical, or even consistent. R&H filed Answers

maintaining its position that the Warrick evidence was legitimate, as was its conduct throughout

these proceedings. However, Gartenberg, Davis, Joseph, McLaughlin and Greenetz, all of whom

were participants in the original investigation (except Greenetz) and have direct knowledge

concerning the Warrick evidence, filed Answers in which they denied having knowledge or

information sufficient to form a belief as to the truth of plaintiff's allegations concerning the

Warrick evidence (as well as events related to the underlying investigation). Now, the

depositions of Davis and Joseph reveal that the Harkins firm withheld critical information from those clients who participated in the original investigation, and whose information concerning the challenged events is directly contrary to the position taken by R&H and those who have aligned with it. *See Teleglobe Communications*, 493 F.3d at 368, *citing* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121 cmts. e(1)-(2)("The Restatement's conflicts rules provide that when a joint attorney sees the co-clients' interests diverging to an unacceptable degree, the proper course is to end the joint representation.").

It is apparent that the Harkins firm has conducted the litigation consistent with the wishes and interests of Rohm and Haas Company (and those others who have maintained that there was no wrongdoing in the original state court case). It is also apparent that the purpose of the joint representation was so that R&H, which has funded the defense of the R&H defendants, could control the tactical (and other) decisions in the litigation such that its interests in the litigation were advanced and protected to the fullest extent possible. This was no more evident than in the Answers filed in *Jackson I-III*, where the Harkins firm filed Answers: a) on behalf of R&H, admitting that the Warrick evidence was legitimate and offering it for its truth; and b) on behalf of Gartenberg, Davis, Joseph, McLaughlin, and Greenetz denying (based on lack of knowledge or information) plaintiff's fraud allegations, even though the co-clients have direct knowledge that a fraud occurred. This course of action cannot be reconciled with the requirements imposed by the Rules of Professional Conduct.

### 7.        Rule 1.8:  Conflict of Interest:  Current Clients:  Specific Rules.

Rule 1.8(b) states that "A lawyer shall not use information relating to representation of a

client to the disadvantage of the client unless the client gives informed consent, excepts as

permitted or required by these Rules."  The Explanatory Comment states:

> Lawyers are frequently asked to represent a client under
> circumstances in which a third person will compensate the lawyer
> ... such as a corporation sued along with one or more of its
> employees[.]  Because third-party payers frequently have interests
> that differ from those of the client, including interests in
> minimizing the amount spent on the representation and in learning
> how the representation is progressing, lawyers are prohibited from
> accepting or continuing such representations unless the lawyer
> determines that there will be no interference with the lawyer's
> independent professional judgment and there is informed consent
> from the client.  See also Rule 5.4(c) (prohibiting interference with
> a lawyer's professional judgment by one who recommends,
> employs or pays the lawyer to render legal services for another).
> Sometimes, it will be sufficient for the lawyer to obtain the client's
> informed consent regarding the fact of the payment and the identity
> of the third-party payer.  If, however, the fee arrangement creates a
> conflict of interest for the lawyer, then the lawyer must comply
> with Rule. 1.7.

*Pa.R.P.C. 1.8 Explan. Cmt. 11, 12.*  For the same reasons that the Harkins firm violated Rule 1.7,

the firm violated Rule 1.8.


### 8.    Rule 2.1:  Advisor.

Rule 2.1 states that "In representing a client, a lawyer shall exercise independent

professional judgment and render candid advice.  In rendering advice, a lawyer may refer not

only to law but to other considerations such as moral, economic, social and political factors, that

may be relevant to the client's situation."  The Explanatory Comment states, in pertinent part:

> A client is entitled to straightforward advice expressing the
> lawyer's honest assessment.

*Pa.R.P.C. 2.1, Explan. Cmt 1.*

As discussed *supra*, the Harkins firm's self-interest prevents the firm from exercising "independent" judgment.  Further, since the interests of the co-clients are in conflict, the Harkins firm cannot render "candid" advice.[27]

### 9.    Rule 3.1:  Meritorious Claims and Contentions.

Rule 3.1 states "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."  The Explanatory Comment states:

> The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure.

*Pa.R.P.C. 3.1, Explan. Cmt 1.*  On May 7 and 15, 2008, Wayne Davis and Celia Joseph repudiated the contention that the November 2000 and red felt-tip pen versions of Royce Warrick's interview notes are the true notes.  At that point, the Harkins firm knew (if it did not know already) that it was advancing fraudulent evidence as legitimate, was required to make appropriate disclosures to the Court and/or withdraw from representation.  It took none of the required actions.

---

[27]The terms "straightforward," "advice," "expressing," "honest," and "assessment" all are absent when, *inter alia*, the lawyer has withheld from the client the Complaint containing the allegations and claims that are the subject of the lawsuit against him/her, as well as the lawyer's representation.

35

### 10.   Rule 3.2:  Expediting Litigation.

Rule 3.2 states "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."  The Explanatory Comment states:

> Dilatory practices bring the administration of justice into disrepute. Although there will be occasions when a lawyer may properly seek a postponement for personal reasons, it is not proper for a lawyer to routinely fail to expedite litigation solely for the convenience of the advocates.  Nor will a failure to expedite be reasonable if done for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose.  It is not a justification that similar conduct is often tolerated by the bench and bar.  The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay.  Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.

*Pa.R.P.C. 3.2 Explan.Cmt. 1.*

Here, all of the factors discussed in the Explanatory Comment are present.  Throughout the litigation, the Harkins firm repeatedly has frustrated plaintiff's efforts to move his case forward.  This was no more apparent than in plaintiff's six-month effort to obtain handwriting evidence (both an exemplar and normal course writings) from Royce Warrick, whose interview notes are a central document in the litigation, in order to challenge the authenticity of the notes. *See Part D, infra.*

### 11.   Rule 3.3:  Candor Toward the Tribunal.

Rule 3.3 states:

> (a) A lawyer shall not knowingly:

> (1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

36

(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence before a tribunal or in an ancillary proceeding conducted pursuant to a tribunal's adjudicative authority, such as a deposition, and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.

(b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

*Pa.R.P.C. 3.3.*  The Harkins firm's lawyers have filed documents, and made misrepresentations of fact and/or law, which constitute a breach of the duty of candor toward the tribunal.  In addition to the conduct discussed *supra*, plaintiff addresses one particularly egregious violation here.

### a.        The Hearing of January 8, 2008

On January 8, 2008, a hearing was held in the Philadelphia Court of Common Pleas on Plaintiff's Motion for Sanctions for defendants' violation of the Order of December 4, 2007 to produce at least six normal course of business writing samples.  Defendants had not produced the required number of documents, and the documents produced did not constitute proper normal

37

course writings as that term customarily is used within the area of forensic document analysis. Plaintiff's motion sought both compliance with the Order of December 4, 2007 and sanctions. Further, because the motion represented the third time that plaintiff was being forced to move to obtain handwriting evidence from Royce Warrick, and because there already had been two prior sanctions Orders against defendants (connected to the same discovery), plaintiff was seeking a default judgment.[28]

At the hearing, John G. Harkins, Jr., Esquire, counsel for the *Jackson I* defendants, in an improper effort to defeat plaintiff's motion, knowingly misrepresented that defendants had produced to plaintiff a total of "eleven" normal course of business writing samples. Notwithstanding that (according to defendants themselves) only three "documents" had been produced, and that the "documents" that *were* produced merely constituted additional questioned documents and not "normal course writing samples," defense counsel represented that defendants had fully complied with the Order of December 4, 2007:

> THE COURT:
> How many samples do you have?
>
> MR. SILVERBERG:
> According the [defendants], three.
>
> MR. HARKINS:
> No, eleven.
>
> THE COURT:
> He just said eleven.
>
> MR. SILVERBERG:

---

[28]On December 6, 2007, defendants in *Jackson I* filed a Motion for Clarification which, in essence, sought reconsideration of the sanctions awarded against defendants in the Order of September 11, 2007.  On January 3, 2008, the motion was denied.

No, according to their own letter to me, it's three.  The letter of December 14 says two, and then if you go to Exhibit G - -

THE COURT:
All right.  Mr. Harkins, you are stating for the record here today as an officer of the Court that you have provided eleven handwriting exemplars to counsel; correct?

MR. HARKINS:
Absolutely, and the order says samples.  We said - - yes, they are documents, but the documents had, the first one, seven different pages, and the second one, four different pages; so he's got eleven.

MR. SILVERBERG:
A page is not a document, Your Honor.

MR. HARKINS:
Well, it's not a document that's ordered, Your Honor, it's a sample.

MR. SILVERBERG:
That's like saying a word is a document.  A word is not a sample, Your Honor.[29]
        In their letter of December 14, which is Exhibit "F" they say they are providing two; and in their letter of December 17th, which is Exhibit "H" they say they are providing one more.  So according to them, they have provided three.  Now he says they are providing eleven.  Even they represent to us they are not compliant, which is why we are here.
        They know a normal - course writing is not a word and it's not a page, it's a document.  That's what they represented to us, which is why we're here.

........................................

He is characterizing each page as a document.  There is no authority for that, and he's not providing any authority for that.

........................................

_____

[29]In fact, one page (from the pre-printed slide presentation) contains only four handwritten letters, "GAAP," which appears to be an acronym for "generally accepted accounting principles."

39

THE COURT:
Anything else?

MR. SILVERBERG:
No, other than we're accepting their representations, for purposes of this motion, which we've included as exhibits, Your Honor.

THE COURT:
You're accepting his representation that he gave you eleven samples - -

MR. SILVERBERG:
No, no, I'm accepting his representation - -

THE COURT:
No, I'm accepting it and I'm placing it on the record.

MR. SILVERBERG:
Okay.

THE COURT:
Mr. Harkins has stated on the record today as an officer of the Court that they provided you eleven samples as required by Judge Panepinto's order.

MR. SILVERBERG:
Okay.

THE COURT:
Alright?  This motion is denied.[30]/[31]

---

[30]In the letter of December 14, 2007, defendants *conceded* that the seven pages being produced did *not* constitute the six samples they were required to produce pursuant to the Order of December 4, 2007, and promised to produce additional documents if "other samples" were located.  Yet, at the hearing of January 8, 2008, Mr. Harkins represented to Judge Manfredi that eleven "pages" equaled eleven "samples."  These positions cannot be reconciled.  Rather, faced with the prospect of a default judgment, the record is plain that defense counsel knowingly misrepresented what was produced in order to defeat the motion.

[31]In her letter of December 17, 2007, defense counsel reiterated that "Despite the short time frame allotted for producing documents, Ms. Warrick undertook an exhaustive search for documents with her handwriting on them and found *only two* dated during the time period you requested.  We produced them." (emphasis supplied).

40

*N.T. 01/08/08 at 7:17-11:12, Exh. "M"*.

In Eleanor Morris Illoway's letter of December 14, 2007, defendants *conceded* that the seven pages being produced did *not* constitute the six samples they were required to produce pursuant to the Order of December 4, 2007, and promised to produce additional documents if "other samples" were located.[32]  *See Letter of 12/14/07 from E.M. Illoway to R. Silverberg, Exh. "N"*.  Yet, at the hearing of January 8, 2008, Mr. Harkins represented to Judge Manfredi that eleven "pages" equaled eleven "samples."  These positions cannot be reconciled.  Rather, faced with the prospect of a default judgment, defense counsel knowingly misrepresented what was produced in order to defeat the motion.  Although Eleanor Morris Illoway, Mr. Harkins' partner, was present in the Courtroom at the time Mr. Harkins misrepresented the number of normal course writings that had been produced to plaintiff, Illoway stood silent even though Illoway authored the letters of December 14, and 17, 2007, and therefore, knew the representations made by Harkins to defeat the motion were false.


### 12.    Rule 3.4:  Fairness to Opposing Party and Counsel.

Rule 3.4(a) states "A lawyer shall not unlawfully obstruct another party's access to evidence . . ."  As discussed *supra* and *infra*, the Harkins firm repeatedly interfered with plaintiff's efforts to obtain handwriting evidence from Royce Warrick which, *inter alia*, is now the subject of obstruction of justice charges in *Jackson III* and the impending Consolidated

---

[32]In her letter of December 17, 2007, defense counsel reiterated that "Despite the short time frame allotted for producing documents, Ms. Warrick undertook an exhaustive search for documents with her handwriting on them and found *only two* dated during the time period you requested.  We produced them." (emphasis supplied).

Amended Complaint.

### 13.    Rule 4.1:  Truthfulness In Statements to Others.

Rule 4.1 states "In the course of representing a client a lawyer shall not knowingly: a)

make a false statement of material fact or law to a third person; or b) fail to disclose a material

fact to a third person when disclosure is necessary to avoid aiding and abetting a criminal or

fraudulent act by a client, unless disclosure is prohibited by Rule 1.6."  The Explanatory

Comment states:

> Under Rule 1.2(d), a lawyer is prohibited from counseling or
> assisting a client in conduct that the lawyer knows is criminal or
> fraudulent. Paragraph (b) states a specific application of the
> principle set forth in Rule 1.2(d) and addresses the situation where
> a client's crime or fraud takes the form of a lie or
> misrepresentation. Ordinarily, a lawyer can avoid assisting a
> client's crime or fraud by withdrawing from the representation.
> Sometimes it may be necessary for the lawyer to give notice of the
> fact of withdrawal and to disaffirm an opinion, document,
> affirmation or the like. In extreme cases, substantive law may
> require a lawyer to disclose information relating to the
> representation to avoid being deemed to have assisted the
> client's crime or fraud. If the lawyer can avoid assisting a client's
> crime or fraud only by disclosing this information, then under
> paragraph (b) the lawyer is required to do so, unless the disclosure
> is prohibited by Rule 1.6. Rule 1.6 permits a lawyer to disclose
> information when necessary to prevent or rectify certain
> crimes or frauds. See Rule 1.6(c). If disclosure is permitted by Rule
> 1.6, then such disclosure is required under this Rule, but only to the
> extent necessary to avoid assisting a client crime or fraud.

*Pa.R.P.C. 4.1 Explan.Cmt. 3.*  Arguably, this Rule is as significant to the instant case as any.  The

testimony of Davis and Joseph explain the reason why the lawsuit was withheld from them for

four years.  The Harkins firm knew that the participants in the original investigation (excluding

Warrick herself) would not support the authenticity of the Warrick evidence.  Therefore, in order

to control them and the litigation, the Harkins firm entered appearances for them and then proceeded to keep them in the dark.

Whatever the Harkins firm may have known prior to May 2008, once their clients confirmed that the two versions of the Warrick notes were not Warrick's true notes, their duties under Rule 4.1 (and others) clearly were implicated. "Ordinarily, a lawyer can avoid assisting a client's crime or fraud by withdrawing from the representation. Sometimes it may be necessary for the lawyer to give notice of the fact of withdrawal and to disaffirm an opinion, document, affirmation or the like." *Id*.

### 14.    Rule 8.4:  Misconduct.

Rule 8.4 states:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

*Pa.R.P.C. 8.4*.  For the reasons discussed *supra*, the Harkins firm's lawyers have engaged in professional misconduct.

### D.   THE HARKINS FIRM'S SELF-INTEREST IN THE LITIGATION PRECLUDES ANY FORM OF CONTINUING REPRESENTATION

In *Hesling*, the district court noted that a "*per se* unwaivable conflict of interest" exists where "the attorney's self-interest in avoiding criminal charges or harm to his reputation were enough to influence every aspect of his representation of defendant[.]"  2007 U.S. Dist. LEXIS 24209, at *12 (cites omitted).

Pursuant to Section 1962:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).[33]  It is also unlawful for anyone to conspire to violate § 1962(c).  *See* 18 U.S.C. § 1962(d).

In *Jackson III*, the Harkins firm has been identified as both an "enterprise" within the meaning of RICO, and therefore, that persons "employed by or associated with" the enterprise conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.  *See Jackson III proposed Third Amended Complaint at ¶190.*[34]  Therefore, the Harkins firm has had an interest in vindicating *itself* both with respect to the charges and its own reputation, at least concerning those allegations where its own conduct

---

[33]In order to plead a violation of RICO, a plaintiff must allege: 1) conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity.  *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004); *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002), *citing Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

[34]As discussed *supra*, it is anticipated that the allegations and claims contained in the *Jackson III* proposed Third Amended Complaint will also be contained in the Consolidated Amended Complaint.

is directly implicated.

The Harkins firm also has (or may have) a separate self-interest with respect to its professional services and/or professional liability.  For example, but not by way of limitation, the March 2006 termination of plaintiff's employment was a violation of 18 U.S.C. § 1513, one of the delineated predicate acts within the meaning of 18 U.S.C. § 1961(1), as well as ERISA.[35]  To the extent that the Harkins firm counseled R&H that it was within its rights to terminate plaintiff's employment, or that the termination would not give rise to any additional claims, the firm has a self-interest in both vindicating its advice to its clients, and itself generally.  In turn, its actions within the litigation are born of its own self-interest, and not the interests of its clients.


E.      THE HARKINS FIRM IMPROPERLY ASSERTED ATTORNEY-CLIENT
        PRIVILEGE

"When the advice of counsel is sought in aid of the commission of crime or fraud, the communications are not "confidential" within the meaning of the statute and may be elicited from the client or the attorney on the witness stand."  *In re: Investigating Grand Jury No. 88-00-3505*, 593 A.2d 402, 407 (Pa. 1991).  "A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help in the law.  He must let the truth be told."  *Id.*, *citing Nadler v. Warner Company*, 321 Pa. 139, 143-144 (1936)(internal cites omitted)..  As the Pennsylvania Supreme Court has stated:

There is a privilege protecting communications between attorney

---

[35]Not only was the discharge a predicate act within the meaning of 18 U.S.C. §1961(1), the Harkins firm's continuing conduct in the litigation constituted additional predicate acts, including violations of 18 U.S.C. §§1503, 1512.  *See e.g. Jackson III Proposed Third Amended Complaint at ¶¶188-209.*

and client.  The privilege takes flight if the relation is abused.

*Id*. (internal quotes omitted)(cite omitted).

Plaintiff has contended that the *Jackson I* defendants conspired with their counsel to advance the fraudulent evidence, and otherwise to corrupt the state court proceedings and to gain a judgment, which they did.  In the May 2008 depositions of Wayne Davis and Celia Joseph, the Harkins firm lawyers repeatedly asserted the attorney-client privilege to block plaintiff's efforts to obtain evidence to support his fraud and abuse of process claims.  *See e.g. Joseph Dep. (05/15/08) at 114:11, Exh. "F"* ("MR. REED:  I object.  You are not to disclose the substance of communications with counsel, whether they be at Morgan Lewis or other counsel retained to represent you in the litigation or in-house counsel who were providing legal advice to you in connection with your participation in [the original state court] trial.").

The assertion of the privilege is inconsistent with the crime-fraud exception to the attorney-client privilege.  Where, as here, the claim is that the attorney and client conspired to corrupt a trial, the communications between them may not be shielded from discovery.  The privilege may not be used as sword or shield to defeat fraud and abuse of process claims based (in part) upon attorney-client communications.

## F.      THE HARKINS FIRM HAS ENGAGED IN AN INTENTIONAL PERSISTENT, FAILURE TO COOPERATE

As discussed *supra*, the Rules of Professional Responsibility impose an obligation upon counsel to cooperate in the litigation process.  However, the Harkins firm engaged in a pattern on conduct intended to interfere with plaintiff's efforts to prepare his case for trial, and more generally, the due administration of justice.

On June 28, 2007, plaintiff served a Notice of Deposition for Royce Warrick (for purposes of obtaining a handwriting exemplar and related testimony) for July 10, 2007.[36]  *See Notice of Deposition and Letter of 6/28/07 from R. Silverberg to J. Harkins, Exh. "P"*.  On July 2, 2007, defendants requested that plaintiff agree to stay all discovery until their Preliminary Objections were decided.  *See Letter of 7/2/07 from E.M. Illoway to R. Silverberg, Exh. "P"*.[37]  On that same date, plaintiff wrote to defense counsel stating that the Court makes clear that the pendency of Preliminary Objections does not operate as a stay of discovery, and that plaintiff would not agree to do so.  *See Letter of 7/2/07 from R. Silverberg to E.M. Illoway, Exh. "P"*.

On July 3, 2007, plaintiff sent a letter to defendants stating:

> Your letters (and threat of motion practice) suggest an intention to obstruct our effort to obtain legitimate discovery.  You and your firm are under a continuing duty to disclose frauds upon the court, a duty that supercedes the duty to your clients.  That duty cannot possibly be reconciled with a contemporaneous effort to block discovery of a client's fraud.

*See Letter of 7/2/07 from R. Silverberg to E.M. Illoway, Exh. "P"*.  On July 3, 2007, defendants filed a motion for protective order for purposes of obtaining a stay of discovery pending the outcome of defendants' Preliminary Objections.  On July 9, 2007, plaintiff wrote defense counsel stating that defendants' motion, in itself, did not operate as a stay, and that plaintiff expected Warrick to be produced for her deposition on July 10, 2007 as scheduled.  *See Letter of 7/9/07 from R. Silverberg to E.M. Illoway, Exh. "P"*.  On July 9, 2007, defendants filed an Emergency

---

[36]The letter accompanying the Notice stated "If the date is not convenient, please provide me with an alternative date that is close in time to the date stated in the Notice."  *See Letter of June 28, 2007 from R. Silverberg to J. Harkins, Exh. "P"*.

[37]For purposes of this section, all correspondence and other documents will be marked collectively as Exhibit "O", and attached in date order.

Motion to Stay Discovery.[38]  On July 10, 2007, the Court granted defendants' motion to stay

discovery pending disposition of defendants' Preliminary Objections.[39]  The stay was lifted by

Order dated August 6, 2007 when the Court overruled defendants' Preliminary Objections (in

their entirety).

On August 9, 2007, plaintiff re-scheduled the deposition to August 16, 2007.[40]  *See Letter*

*of 8/09/07 from R. Silverberg to J. Harkins, Exh. "P"*.  On August 10, 2007, defense counsel

informed plaintiff that Warrick would be on vacation the week of August 13, 2007.  *See Letter of*

*8/10/07 from J. Harkins to R. Silverberg, Exh. "P"*.  On August 10, 2007, plaintiff re-scheduled

the deposition to August 20, 2007, stating that "We consider this a hard date since this

accommodates Ms. Warrick's vacation, since there are three partners at your firm who have

entered an appearance, and since we have had to reschedule our expert."  *See Letter of 8/10/07*

*from R. Silverberg to J. Harkins, Exh. "P"*.  On August 10, 2007, in a letter to defense counsel,

---

[38]While arguably legitimate, it is apparent that the true purpose of the motion was to block the Warrick deposition/handwriting exemplar.  Indeed, Warrick subsequently failed to appear for her deposition/exemplar on August 20, 2007.

[39]In an effort to gain the stay, John G. Harkins, Jr., Esquire, counsel for defendants, misrepresented to the Court both the merits of defendants' Preliminary Objections, as well as the procedural history (including with respect to *Jackson II* and *III*), stating that plaintiff had "Lost at every turn."  This forced plaintiff's counsel to write a letter to Judge Manfredi the following day enclosing an Order from *Jackson II*, dated December 19, 2006, in which the district court had granted plaintiff leave to amend the Amended Complaint.  In fact, the district court has since permitted numerous claims to proceed.  *See e.g. Jackson v. Rohm and Haas Co.*, 2007 U.S. Dist. LEXIS 65900 (E.D. Pa. Sept. 5, 2007)(ERISA, fraud, negligent misrepresentation); *Jackson v. Rohm and Haas Co.*, 2007 U.S. Dist. LEXIS 67666 (E.D. Pa. Sept. 13, 2007)(RICO, RICO conspiracy, ERISA (breach of fiduciary duty), ERISA (denial of benefits)).

[40]The letter accompanying the Notice stated "If the date is not convenient, please provide me with an alternative date that is close in time to the date stated in the Notice."  *See Letter of 8/9/07 from R. Silverberg to J. Harkins, Exh. "P"*.

plaintiff's counsel stated:

> As you know, the Amended Complaint alleges a long history of discovery abuses dating back to the original state case, including the withholding of the Warrick notes in order to defeat their discovery. Among other things, it is also claimed that defendants engaged in a pattern of refusing to produce witnesses for their scheduled depositions. While we accept your representation with respect to Ms. Warrick's unavailability, and will seek to accommodate future scheduling conflicts within reason, we will not tolerate any interference with our legitimate efforts to obtain discovery. Any such effort will be considered both abusive and obstructive and will be brought to the immediate attention of the Court, particularly since the Amended Complaint makes clear it has been defendants' pattern for a period of years.
>
> As discussed in my prior correspondence, while defendants are entitled to a zealous defense, they are not entitled to an unethical one. With respect to Ms. Warrick, it is unclear how counsel connected to this case who have a duty to prevent and disclose frauds, can reconcile that duty with producing Ms. Warrick for a deposition.[41]

*See Letter of 8/10/07 from R. Silverberg to J. Harkins, Exh. "P".*

On August 13, 2007, defense counsel wrote to plaintiff's counsel that Warrick "is on a trip this week . . .  However, it appears that she *could* be available for a deposition on August 30."  *See Letter of 8/13/07 from J. Harkins to R. Silverberg, Exh. "P"* (emphasis supplied).  In the same letter, defense counsel stated:

> You have stated that the sole purpose of taking Ms. Warrick's deposition is to obtain a writing exemplar. In order to proceed, *we demand an offer of proof as to what you expect to accomplish through an exemplar.*

---

[41] *See Pa.R.P.C.3.3(b)*("A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.").

*See Letter of 8/13/07 from J. Harkins to R. Silverberg, Exh. "P"* (emphasis supplied).

On August 20, 2007, Warrick failed to appear for her duly noticed deposition.  On August 21, 2007, plaintiff's counsel wrote to defense counsel that "Your request for an 'offer of proof' with respect to Ms. Warrick, who testified (and which defendants maintain) she authored notes that plaintiff claims were fabricated, is utter nonsense."[42]  *See Letter of 8/21/07 from R. Silverberg to J. Harkins, Exh. "P"*.  On August 22, 2007, counsel for defendants notified plaintiff's counsel that, *inter alia*, he would not permit defendant Warrick to answer any questions at a deposition.  *See Letter of 8/22/07 from J. Harkins to R. Silverberg, Exh. "P"*.

On August 28, 2007, plaintiff served his Motion to Compel Warrick's deposition/exemplar upon defendants.[43]  On August 30, 2007, defense counsel proposed

---

[42]As of the date of the letter, it had been nearly seven weeks since service of the Notice of Deposition.  As discussed *supra*, while any demand for an "offer of proof" was nonsense, any legitimate demand would have been made at the time of service.

[43]In what can only be characterized as a "bizarre" sequence of events, Mr. Harkins abruptly began treating August 30, 2007 as the deposition date even though the parties had never agreed, *or even discussed*, conducting the deposition on that date.  As undersigned counsel stated:

> Royce Warrick failed to appear for her deposition (for purposes of providing an exemplar) on August 20, 2007, and we made no subsequent effort to re-schedule it.  I am not going to engage in a debate about what the words "could be available" mean as stated in your letter of August 13, 2007, the substance of which changed in your letter of August 22, and further changed in your letter of August 27.  As you know, we never agreed to take the deposition on August 30, or even discussed doing so.  We made three attempts to schedule the deposition (the last of which was to accommodate Ms. Warrick's vacation), culminating in her unexcused failure to appear on August 20.  You cannot simply manufacture cooperation after-the-fact in order to appear cooperative, or to avoid the consequences of your prior failure to cooperate.

September 13, 24, and 25, 2007 for the Warrick deposition.  *See Letter of 8/30/07 from J. Harkins to R. Silverberg, Exh. "P".*

On September 11, 2007, the Court granted plaintiff's motion to compel, sanctioned defendants for Warrick's failure to appear, and stated that "Defendants shall be subject to further sanction(s) for failure to comply with this Order and/or the Pennsylvania Rules of Civil Procedure."  At the time of the hearing, defense counsel informed plaintiff's counsel that September 13, 2007 was no longer an "available date" for the deposition.  On September 12, 2007, plaintiff wrote to defense counsel proposing September 24, 25, and 28, 2007 for the deposition, stating that "Per your letter of August 31, I understand that September 24 and 25 are available dates, and since you did not mention the 24th or 25th yesterday, I assume the dates are still good."  *See Letter of 9/12/07 from R. Silverberg to J. Harkins, Exh. "P".*  On September 13, 2007, defense counsel confirmed the deposition for September 25, 2007.  *See Letter of 9/12/07 from J. Harkins to R. Silverberg, Exh. "P".*

On September 19, 2007, in view of the Memoranda/Orders of September 5 and 13, 2007 in *Jackson II* and *III* granting in part and denying in part defendants' motions to dismiss in those cases, plaintiff determined to briefly postpone the deposition until defendants' had filed their respective Answers in all cases.  *See Letter of 9/19/07 from R. Silverberg to J. Harkins, Exh. "P".  See also Jackson v. Rohm and Haas Co.*, 2007 U.S. Dist. LEXIS 65900 (E.D. Pa. Sept. 5, 2007); *Jackson v. Rohm and Haas Co.*, 2007 U.S. Dist. LEXIS 67666 (E.D. Pa. Sept. 13, 2007).

On October 9, 2007, plaintiff requested that defense counsel provide two alternative dates

_____

*See Letter of 8/29/07 from R. Silverberg to J. Harkins, Exh. "F".*

51

for purposes of scheduling the Warrick deposition within the next 10 days.  *See Letter of 10/9/07 from R. Silverberg to J. Harkins, Exh. "P"*.  On October 10, 2007, defense counsel responded that it may not be possible to schedule the deposition in the next ten days, but that:

> We will make every effort to get back to you by early next week
> with possible dates with the goal of finding a mutually convenient
> date as promptly as possible.

*See Letter of 10/10/07 from I.M. Illoway to R. Silverberg, Exh. "P"*.[44]  On October 15, 2007, in response to plaintiff's request for an extension to respond to defendants' 150-Paragraph New Matter, defense counsel stated that defendants would be willing to grant an extension "if you agree to forgo initiating or taking any discovery in the interim."[45]  *See Letter of 10/15/07 from I.M. Illoway to R. Silverberg, Exh. "P"*.

On October 15, 2007, having received no response to the letter of October 9 requesting dates for the Warrick deposition, plaintiff wrote defendants stating that two alternative dates must be provided by October 17 for a deposition to occur by October 27, or that plaintiff would be forced to impose a date.  *See Letter of 10/15/07 from R. Silverberg to I.M. Illoway, Exh. "P"*. On October 16, 2007, defense counsel wrote that she was still waiting to hear from "one person concerning possible dates."  *See Letter of 10/16/07 from I.M. Illoway to R. Silverberg, Exh. "F"*.

---

[44]Defense counsel's letter is emblematic of the longstanding difficulty that plaintiff has faced.  Plaintiff asked for a commitment, and defense counsel stated "We will make every effort to get back to you."  Plaintiff sought dates, and defense counsel responded that she would get back to plaintiff "with possible dates," and further stated "with the goal of finding a mutually convenient date as promptly as possible."  In other words, defense counsel may as well have not responded at all, because the response offered, committed to, and confirmed nothing.

[45]While this did not, in itself, delay discovery, it was an attempt by defendants to use the professional courtesy of an extension as a device to gain an agreement to further delay the Warrick deposition.  Ultimately, plaintiff moved for the extension, which was granted as unopposed.

On October 25, 2007, plaintiff wrote to defense counsel confirming the deposition for November 5, 2007.  *See Letter of 10/25/07 from R. Silverberg to S. Reed, Exh. "P"*.  On that same date, plaintiff served a Notice of Deposition for defendant Jane Greenetz for November 5, 2007 for purposes of obtaining a handwriting exemplar and related testimony.  As discussed in plaintiff counsel's letter to defense counsel, the purpose of scheduling both exemplars to occur on the same date was so that plaintiff's expert would only have to appear at a single proceeding. On October 25, 2007, defense counsel wrote to plaintiff's counsel stating that Warrick was no longer available on November 5 due to a "significant business obligation," but that Warrick was available on November 7, 2007, which plaintiff's counsel accepted.  *See Letter of 10/26/07 from R. Silverberg to S. Reed, Exh. "P"*.  On October 29, 2007, defense counsel wrote to plaintiff's counsel stating that she had "learned that Ms. Greenetz will be on vacation next week," and asking whether plaintiff still wanted to proceed with the Warrick deposition "given the scheduling of your expert," and that "If I have hot heard from you by the end of the day tomorrow, I will assume that you will want to reschedule Ms. Warrick's deposition."[46]  *See Letter of 10/29/07 from I.M. Illoway to R. Silverberg, Exh. "P"*.

On November 7, 2007, Royce Warrick appeared for her duly noticed deposition.  While Warrick answered certain questions, she failed and refused to provide a handwriting exemplar. As the following colloquy shows, defendants never intended to go forward with a handwriting

---

[46]It is apparent that the re-scheduling of the Greenetz deposition was a further attempt by defendants to forestall the Warrick deposition.  However, plaintiff was unwilling to re-schedule the Warrick deposition/exemplar, even if it meant that plaintiff's expert would be required to make two appearances.

exemplar:[47]

MR. SILVERBERG:

Now, I did have some instructions with respect to the exemplar but I understand that your counsel has some concerns about the exemplar since we were going to have Mr. Phillips conduct the exemplar.

MS. ILLOWAY:

Yes.  We object to Mr. Phillips conducting the exemplar.  We understand that he is not an attorney in Philadelphia, a member of the Bar, and he's certainly not of record in this case.  And this is a judicial proceeding and it would be improper to have a non-attorney conduct the balance of the deposition.

MR. SILVERBERG:

Well, it's not my intention for the exemplar to be on the record.  Now, if you're objecting because it's in the form of a deposition, she was noticed for a deposition so that we could make sure that she was here, so that we could make sure that she was properly instructed, so that we could make sure that all of the proper safeguards were put in place.  It was my intention for it to be on the record but I don't think that it's necessary that it be on the record but it's my preference that it be on the record.

MS ILLOWAY:

If Mr. Phillips is going to give you questions to ask and you ask questions and its on the record, then we are willing to stay and proceed.  If it is your intention to have Mr. Phillips ask the questions or give the directions, then we are not going to proceed.

MR. SILVERBERG:

What is the practical difference of that and what is your authority?  I'm willing to go off the record and have Mr. Phillips take an

---

[47]It must be remembered that defendants abandoned their position, and permitted Jane Greenetz to provide a handwriting exemplar, even though plaintiff's forensic document examiner provided the instructions, and not plaintiff's counsel.

exemplar.

MS. ILLOWAY:

No.  Well, we're not going off the record.  That's the first thing.

.......................

MR. SILVERBERG:

What's [] the practical difference if he tells me what questions to ask and then I repeat it to Ms. Warrick?

MS. ILLOWAY:

You noticed the deposition.  This is a deposition and the deposition was to include a handwriting exemplar.  You are the member of the Bar.

.......................

I [] would have thought that this was something you'd thought about in advance and worked out so that you would have the questions.

.......................

MR. PHILLIPS:

Can I make a comment?  I had no intention of asking the deponent any questions. ...  I'm just going to give her instructions.

.......................

MR. SILVERBERG:

You know what?  I want to see the authority.

MS. ILLOWAY:

I didn't bring my Pennsylvania Rules but - -

MR. SILVERBERG:

I have a phone.  You've got a whole law office.  You get me some authority.  We'll go off the record.

MS. ILLOWAY:

I'm not going to do that today.

.....................

MR. SILVERBERG:

Okay.  We've gone back and reviewed the transcript of the hearing before Judge Manfredi on this issue.  It's clear Judge Manfredi has allowed this proceeding to occur, which is why we're here.  We are willing in order for this proceeding - - in order for this exemplar to occur to terminate the deposition and allow Mr. Phillips to take an exemplar if it will accommodate counsel.  If counsel is saying that we're not proceeding with an exemplar under any circumstances, then that's up to counsel and we'll take that up with the Court.  But it's clear that we are here for an exemplar, that we were permitted to do it under these circumstances.  I have both a transcript of an argument and a Court Order.

.....................

MS. ILLOWAY:

There is nothing in this or in any of the briefs that were filed before Judge Manfredi or in Judge Manfredi's Order which would permit a non-attorney to conduct a portion of this proceeding. ... [W]e [sic] were certainly never explained to us that the deposition and the taking of the exemplar were two separate things.  To us, they have been one in the same.  That's the way you noticed it.  That's the way you argued it to the judge, and there's nothing in the Order about allowing a separate exemplar, and we object and require that the entire proceedings be on the record today.  So we have given you another alternative and it's certainly what we assumed, was that you would be asking the questions, as is proper.

MR. SILVERBERG:

Are you willing to submit to an exemplar if we go off the record?

MS. ILLOWAY:

No.

......................

MR. SILVERBERG:

When can we bring Ms. Warrick back - -

MS. ILLOWAY:

We are not coming back unless you as a member of the Bar are going to ask the questions .   We are not coming back for a writing exemplar.

MR. SILVERBERG:

Under what authority?

MS. ILLOWAY:

Because this is a judicial proceeding and you are the one who is authorized to ask the questions.  I'm not going to continue to argue this on the record.

......................

MR. SILVERBERG:

[A]re you going to permit Ms. Warrick or Ms. Greenetz to give an exemplar or unless - - are not going to permit them to give exemplars unless its me who asks the questions?  Yes or no?

MS. ILLOWAY:

That is correct.  And whatever exemplars are done will be done on the record.

MR. SILVERBERG:

Under what authority?

MS. ILLOWAY:

I'm not going to argue that today.  I can see that we're going to have to go to court over this in any event.

57

*N.T. (11/07/07) at 49:16-63:14, Exh. "O".*[48]

On November 15, 2007, pursuant to a Notice of Deposition, plaintiff obtained a handwriting exemplar and related testimony from defendant Jane Greenetz. *See Notice of Deposition, Exh. "P".*  Although the circumstances of the Greenetz deposition were identical to those of the Warrick deposition, and contrary to defense counsel's statements at the Warrick deposition, defendants permitted the Greenetz deposition to go forward even though the instructions for the exemplar were provided by plaintiff's forensic document examiner, and not plaintiff's counsel.

### vi.    The Order of December 4, 2007.

On December 4, 2007, the Hon. Paul P. Panepinto granted plaintiff's Motion for Sanctions for Defendants' Violation of the Order of September 11, 2007 Compelling the Handwriting Exemplar of Defendant Royce Warrick, Violation of the Case Management Order of July 13, 2007, and for Defendants' Persistent Failure to Cooperate in Discovery.   In granting the motion, the Court of Common Pleas Ordered that:

> 1.    Royce Warrick shall provide forthwith: a) a handwriting exemplar to plaintiff, or plaintiff's designated representative, including plaintiff's forensic document examiner; and b) at least six normal course of business handwriting samples from the period 1998-2001;[49]

---

[48]At some point during the colloquy, defense counsel *did* state that defendants would be willing to provide an exemplar to Phillips, but never responded to plaintiff counsel's request for dates, and ultimately determined that they would only agree to do so if plaintiff's counsel provided the instructions.  *N.T. (11/07/07) at 58:14-61:15, Exh. "D".*

[49]At the hearing of December 4, 2007, defendants "absolutely" understood the Court's directives:

4.      Defendants shall be subject to further sanction(s) for failure to comply with this Order and/or the Pennsylvania Rules of Civil Procedure.

*See Order of Sept. 11, 2007, Exh. "P".*

On December 10, 2007, Royce Warrick provided a handwriting exemplar, but defendants failed to produce any normal course of business handwriting samples which, *inter alia*, prevented plaintiff's expert from using the samples as part of the exemplar.[50]  On December 14, 2007, defendants produced to plaintiff two unidentified documents:  a) two pages of handwritten notes of an unknown origin; and b) five pages from a slide presentation with a few handwritten notes or scribbles on them.  In the letter enclosing the two documents, Eleanor Morris Illoway, counsel for defendants, stated:

--------

THE COURT:

I'm asking, can you provide that [i.e. "at least six normal course of business handwriting samples from '98 to '01"] in paragraph one? Yes or no?

MR. HARKINS:

If she has it.  ...  Yes, we'll try to find those exemplars.

THE COURT:

You don't have them?  You don't have that but you have to try.

MR. HARKINS:

Absolutely.

*N.T. 12/04/07 at 10:13-23, Exh. "J"*; *see also id. at 9:25-10:4* (discussing normal course writings).

[50]Plaintiff specifically had requested that Warrick bring the normal course writings with her to the exemplar.

59

> Enclosed are copies of two documents that Royce Warrick located
> in her search for handwriting samples from the period of 1998-
> 2001.  They are numbered RJHI000055-000061.  The documents
> include a number of handwriting samples taken in the normal
> course of business.
>
> After searching through roughly 30 boxes from her office and the
> central files maintained by Rohm and Haas's legal department, Ms.
> Warrick was not able locate any additional handwriting samples
> from the period of 1998 to 2001.  In the event that she
> subsequently finds any other samples that fall within that time
> period, we will produce them to you.

*Letter of 12/14/07 from E.M. Illoway to R. Silverberg, Exh. "P".*[51]

On December 14, 2007, in response to defendants' production, plaintiff's counsel wrote

to defendants' counsel that Judge Panepinto had Ordered defendants to provide at least six

normal course of business writings for Ms. Warrick, stating that in the event defendants failed to

comply with the Order that plaintiff "would be awarded the sanctions being sought."[52]   In the

letter, plaintiff urged compliance with the December 4 Order, stating:

> At their depositions in the original state case, both Celia Joseph
> and David Gartenberg testified that Ms. Warrick was a "copious"
> note taker.  Further, the Order is not limited to legal files, files
> maintained by the legal department, files or documents stored in a
> particular place, or to law-related writings.  Notwithstanding
> whether the documents produced are responsive, or the existence
> of any other documents that may be responsive, Ms. Warrick was
> the Company representative at the trial of the original state case,
> sat and counsel's table, and took handwritten notes throughout the

---

[51]At no time did defense counsel state that responsive documents existed, but were being
withheld on the basis of privilege, or for any other reason.  Further, it strains credulity to suggest
that Royce Warrick, in-house counsel for a world-wide corporation employing more than 15,000,
was unable to locate any responsive documents for the four-year period 1998-2001.

[52]Since this was plaintiff's third motion seeking handwriting evidence from Royce
Warrick, and since plaintiff's prior motions to compel and for sanctions had been granted,
plaintiff sought a default judgment.

three-week trial.

Defendants are in violation of the Order of December 4, 2007. If defendants do not fully comply with the requirements of the Order by the end of business on December 17, 2007, plaintiff will seek appropriate relief from the Court immediately thereafter.

*Letter of 12/14/07 from R. Silverberg to E. M. Illoway, Exh. "P".*[53]

---

[53]Joseph and Gartenberg testified in the original state case:

**MS. JOSEPH:**

And she had taken - - *she and I are both copius note-takers*, . . .

-------------------------

61

On December 17, 2007, after the expiration of both the "forthwith" and ten-day periods set forth in the Order of December 4, 2007, and despite defense counsel's letter of December 14, 2007, defendants produced an excerpt of a third "document," a document that defendants acknowledged that they previously had withheld:

> You are correct that we have notes in Ms. Warrick's handwriting that *were prepared at or regarding the trial* in the original case. Although we originally withheld them on grounds of the attorney client privilege and/or work product doctrine, we are producing with this letter four pages of notes containing additional handwriting samples.  This production is made without waiver of any applicable privileges.

*Letter of December 17, 2007 from E.M. Illoway to R. Silverberg, Exh. "P"* (emphasis supplied); *see Exh. "P"*.[54]


## IV.     CONCLUSION

It is unknown what steps the Harkins firm may have taken before undertaking the joint representation.  It is unknown whether the firm conducted interviews with each of its clients,

---

> **MR. GARTENBERG:**
>
> I'd be very surprised if Celia and Royce did not take notes.   ...
> *They take notes at everything.*

*Joseph Dep. (11/30/00) at 154:2-5, Exh. "L"; Gartenberg Dep. (11/20/2000) at 91:20-92:1, Exh. "Q"* (emphasis supplied in both).  Thus, even though it is well-known within the corporation that Warrick "take[s] notes at everything," defendants essentially produced two pages of notes, and thus willfully failed to comply with the requirements of the Order of December 4, 2007 that defendants produce at least six normal course of business writings.

[54]In her letter, defense counsel reiterated that "Despite the short time frame allotted for producing documents, Ms. Warrick undertook an exhaustive search for documents with her handwriting on them and found only two dated during the time period you requested.  We produced them."

obtained each client's account of the events, reviewed the relevant documents and other evidence with them, discussed the joint representation and the (potential and/or actual) conflicts posed by such an arrangement, and otherwise set about to properly determine each client's interests and whether representation even was possible. However, whether at the outset of the attorney-client relationship or sometime thereafter, it is apparent that the Harkins firm disregarded its duties to its clients, to the Court, and to others, apparently in the name of protecting its business relationship with Rohm and Haas Company, or out of some other improper self-interest.

There is no legitimate basis to accept service of a Complaint and/or to enter an appearance on behalf of a client, and then fail to provide the client with the Complaint after it has been served. There is no legitimate basis to not timely review the Complaint with the client, and to ensure that at a minimum, the client has a proper understanding of the allegations and claims against him/her. There is no legitimate basis to file a motion to dismiss, defend an appeal to the Third Circuit, and to otherwise engage in protracted litigation on behalf of a client who cannot possibly understand, and therefore agree, with the course of action being taken on the client's behalf. Certainly, there is no legitimate basis to file an Answer on behalf of a client that takes a position that is directly contrary to the client's knowledge and information.

This case illustrates a central purpose underlying the Rules of Professional Conduct - the protection of the judicial process. Here, a fraud on plaintiff and Court, a fraud of the highest order, has been carried out for a period of years, in part because the lawyers have ignored their duties under the Rules of Professional Conduct. These same lawyers now must be disqualified, and a Rule to Show Cause should be issued as to why they should not be referred to the Disciplinary Board of the Supreme Court of Pennsylvania.

For these reasons, plaintiff's motion should be granted.


Respectfully submitted,

**RICHARD J. SILVERBERG & ASSOCIATES, P.C.**


BY:  Validation of Signature Code RJS1716
    **RICHARD J. SILVERBERG**
    1500 Walnut Street, Suite 1500
    Philadelphia, PA 19102
    (215) 546-1110
    Attorneys for Plaintiffs